1331190 United States of America v. Almond Richardson Ms. Brown May it please the Court, my name is Gwen Brown and I represent the appellant Almond Richardson. This case is before the Court for the second appeal. He did accept a court-appointed lawyer for appellate purposes, I think. He did. I actually represented him on his first appeal, but not the trial. The second trial he represented himself and procedurally, I guess probably the most significant thing that happened is that during the first trial he was tried for some offenses that concerned one or two dates, and then in the second trial there were some separate dates involved. During the first trial he was prosecuted under a seven-count indictment, he was acquitted on a couple of those charges, and then on the second trial the government dismissed the counts related to the first date. There were some inconsistencies among the testimony of the officers and they dismissed those counts. So in the second trial he proceeded on only three counts. And also significantly is that the primary witness in connection with those counts was a confidential informant, and he died between the first and the second trial. So I have three issues that I've briefed, one of which relates to the sentencing, and that one the government supplemented the record with some documents that mooted the argument. So I'm just going to confine my presentation to the Court to these two issues, then I'll be brief. I know we've all had a long day. So what are the issues you're pursuing? The issues I'm pursuing... The civil testimony? Correct. And... The mistrial issue concerning the prejudicial statements that were made during Sergeant Chambers' testimony, which is the first issue. The government alleged that Mr. Richardson had came into contact with this confidential informant, Garfin Neville, because he was a concerned citizen. Garfin Neville supposedly had contacted them and indicated that he lived in the apartment complex where Mr. Richardson resided and that there were drug activities going on and he wanted to help. And so he agreed to do a controlled by, and the officers set that up. This was also the theory that the government had alleged with the other counts that were thrown out was that it was a concerned citizen that had approached them, and that was actually established at the first trial that that was not the case, that the government had solicited these people. So, Neville supposedly went into the apartment where Mr. Richardson was residing and made a controlled by for Mr. Richardson. None of the officers actually saw that take place. They saw him go into the apartment complex, they saw him come out, but they didn't see him in the apartment complex. So Neville's testimony was really going to be the only person that could refute Mr. Richardson's testimony who said, none of this happened, he said it's all made up, it's all fabricated. So in order for Richardson to successfully make his case, he needed to be able to impeach the testimony of the confidential informant, Mr. Neville. His effort to do that, to show that Neville was not this concerned citizen but was instead someone who should not be trusted, was he wanted to prove that Neville was a murderer, that he was murdered, that he was a drug dealer and he was murdered as a result of his drug dealings. And he also wanted to show that confidential informant testimony is inherently unreliable. And the court would not allow in evidence surrounding the cause of Neville's death, and the court also denied a motion in limine for Mr. Richardson to retain an expert to show that confidential informant testimony is inherently unreliable. So that left Mr. Richardson in a position with only means to try to prove his case, that this confidential informant should not be proved, was going to be through testimony, direct testimony, cross-examination. But you're not pursuing that inherently unreliable denial, that's not part of this, right? That's a very interesting argument, but that's not part of this appeal, directly. It's just . . . It's not, no, it's not, it's not directly part of the appeal. It was my argument . . . You're saying the court gave him no choice but to bring it up in cross-examination. Right. Because he was denied the right for experts to . . . Right. . . . about reliability of a witness or . . . Right. And I didn't, I didn't address, I didn't directly raise that argument because at the time that it was raised, it was within the court's discretion, but my argument was, is that once the motion for mistrial was made, it was something that the court should have considered in evaluating the prejudice occasioned by the statements, which I'm now getting to, that, that Sergeant Chambers made during his testimony. Chambers . . . and it was, this was elicited from the government, I mean, a direct statement from the government. Sergeant Chambers was the first of the government's witnesses to testify. And he stated that during his arrest of Mr. Richardson, Mr. Richardson told him that he was working as a confidential informant for the DEA and that they should not arrest him because that was going to mess up these deals that he was working with the DEA. Mr. Richardson objected and said, I've had no notice of these statements, and the court reprimanded, the government conceded that they had not given notice, and the court reprimanded the government and said, hey, you should have given notice of these statements months, if not years ago. Don't get into that. And then it, then it instructed the jury to disregard the statements, and the cautionary instruction given was something to the effect that there's federal rules of evidence and they weren't complied with, and so I instruct you to disregard these statements. Then later, Chambers testified that Neville claimed that the two of them had met when they were working together as confidential informants. And then the third statement that was, that I've referenced is one where Chambers referenced some drugs that were not charged in the indictment. And the government has essentially argued that these three statements, that the cautionary instructions cured any prejudice that was occasioned by the instructions, and my argument for the appeal is that they were not in the context of the case, particularly given that the government deliberately elicited this testimony from Chambers that he was working as a DEA agent. Those were statements from, from Mr. Richardson himself, right, or are these statements from Neville? It was, it was, well, according to Chambers, Mr. Richardson himself said that during, um, his arrest. And that was brought up in the government's case-in-chief. Correct. It hadn't been previously disclosed, so it shouldn't have been used. Correct. Correct. And the court agreed with that, but just gave a cautionary instruction, and you say that it was so prejudicial. Why was it so prejudicial? Well, just because, because his sole defense in this case was going to be to try to show that a confidential informant is somebody who's inherently unreliable, that this guy's a bad drug dealer, and if then you have Almond Richardson also working as a confidential informant, that really undermines his whole defense. So, and then the second argument that I had, um, was that they then used the, uh, transcript of, of the confidential informant at the trial, so then he also was denied the right to cross-examine that confidential informant. I have a question about that. The decision to grant the new trial with himself as the lawyer, was, that wasn't based upon that the lawyer was actually incompetent in his questioning. It was just based upon the constitutional right, which is a very important right, that he had the right to proceed for himself. Right? That's correct. So, there was no determination. I think it's a harder case if the lawyer's found to be ineffective, because then you can't say that they had a full and fair opportunity if we know that the lawyer was ineffective. Right. Right. And I agree with you. That's completely true. I mean, and the, and the law is clear that if you're in a, and if you're in the same position, um, to conduct a cross-examination, which of course his attorney would have been, I've just, but it does present an unusual situation, and, um, and so I thought it was appropriate to present it to the court, um, for consideration since it was, you have previously ruled that this was a Sixth Amendment violation to not allow him to proceed representing himself. This is a really interesting Crawford issue. In fact, we scoured the court cases trying to find one with similar, where the lawyer was subsequently discharged for failing to do what the client wanted. Couldn't find one. Yeah. Do you have any authority? I have not found any other case where this has come up in this precise fashion. The government has cited some cases that are kind of general on the general law, but not where we have this situation where the, I mean, it's unusual. I don't think I would have expected to. If we do find a confrontation clause violation, how does the harmless error work here? Must the government show beyond a reasonable doubt that the violation was harmless? Um, I would think that they would need to show that beyond a reasonable doubt that the violation was harmless, and then, you know, in, in the context of this trial, given the other evidentiary rulings which impaired his ability to present his, his defense, I would think they wouldn't be able to meet that burden. But it's a high hurdle to say that there is a confrontation clause violation where they, he did have a lawyer who could have cross-examined him about the topic. Agreed. It's, it's a difficult thing. Well, and I mean, the problem that I see is you can always find something that you would have liked to ask, even as your, as yourself. When you go back and look at your own transcripts, you go, wow, I wish I'd asked that. That isn't enough to say, okay, that's a, an error that requires reversal. I mean, wow. Well, I mean, I agree. I think that the stronger of the two issues is the first issue concerning the mistrial. I mean, I don't want to, I think it, it is an interesting issue. Um, and it, it does present some unusual questions.  Um, but I agree that it's, it's, um, that it's hard, that it does put, I mean, I can't, I cannot argue and I won't argue that, that the prior attorney was not meeting the definition of, um, someone who's similar, similarly situated. And doing his best and whatever. Right. But it's still, it's still, this defendant had the right to represent himself. But the problem is we can't do a, we, we tried to do a do over, but this man is dead. Right. So then the question is, does this man's death mean that your client gets a free pass? Well, it. That would be worrisome in and of itself because then, uh, CIs are even more at risk of untoward events than they already are. Right. Now, and there was no contention that he was in any way involved. No, I, I'm not saying that he was, but I'm just saying we don't really want to create a situation where the death of the key witness is enough. Right. To end the debate and that's kind of the argument here. Because I don't really know how you cure this. I mean, you can't really have another trial where you cross examine him better if that's the problem. Right. You can't. Or as you say, the con, the confrontation clause is the most important thing and therefore there is no trial. Right. Right. Yeah. I mean, because the confrontation clause, are, are we bound to say if the lawyer had a full and fair time? Is, are we bound with precedent that if the lawyer had a chance to ask him at the prior trial, then there's no confrontation clause violation? Are we bound as under circuit precedent or is it an open question in this circuit? Uh, well. Could, could this court hold that because he, that he didn't get to cross examine him as he wished, that that, and it's a confrontation clause violation? Or are we bound by prior precedent to say as long as the lawyer had a chance to cross examine him, it's not a confrontation clause violation? No. No. You wouldn't be bound to say that. I think the circumstances of this case present an, an unusual situation that hasn't been addressed, addressed. And it, um, let me find exactly how it's worded, what the standard is. Would it be more of a ineffective assistance of counsel challenge that the cross examination was, was not effective representation? No. I, I think it's . . . I, I mean not, I'm not saying that happened here, but if you were wanting to bring that challenge rather than a confrontation situation, we did have a cross examination by the, by the lawyer and the only way to perhaps raise it if it was to be raised would be challenging that the effectiveness of the cross examination was ineffective. Well, no. I don't want to say that. I think . . . I'm not saying you're saying that, but I'm just saying that. No. And I, I don't think that that's really, I don't think that that's really the issue under the case. I mean, Mr. Richardson himself conceded that, that his, you know, that he, he thought his lawyer was a good lawyer. Um, it's just that he, this court has already said that he had the Sixth Amendment, right, right under Sixth Amendment to self-representation. Um, and he specifically, Mr. Richardson specifically indicated that he had issues with the way that cross examination was conducted. Now, what, what you've raised is how do we go back and, and fix this now because we have, um . . . All right. Mr. Neville's dead, whatever we say. Whatever we say. The question is . . . Right. Can we really retry this? If we say, well, you're right, there was some issue here, then the answer is he goes free. That's your argument in essence. And that seems . . . They should, they, there's, there's two options. One is that they can, they can prove it without the testimony, without introducing that trial transcript. They can try to prove it with their own officer's testimony. Um, and that's, that's not an impossibility. It's just a matter, it leaves it to some circumstantial evidence, but they could do it that way. Or another, another option would be that if they're going to allow in that testimony, then they shouldn't be also allowed . . . I mean, just the whole context of this whole trial, which is what gave rise to the motion for mistrial, they shouldn't also be allowed to be springing, um, comments on him that then he's not allowed . . . Inequality. Right. Which is appropriate to consider in denying him, in considering a motion for mistrial is whether or not he was denied his right to a fair trial. Right. But it actually cuts the other way on, yeah, on, that it's not harmless. Because if he's, if this is really the only thing standing between him and an acquittal, then if there is a confrontation clause violation, then this, then it, then you win. Right. So, because, so it cuts the other way for this confrontation clause for the harmlessness. I mean, it might help say, oh, you can have a new trial, but to win the confrontation, you need to say that it's, um, that there is no case without this. Well . . . Well, I mean, you could also analyze it as harmlessness that the information wasn't that critical that your client wanted to draw out. Wait, I'm sorry. What do you mean? In other words, his argument is I didn't get to do the cross I wanted to do, because I wanted to draw out all this impeachment and so on and so forth. Another analysis of harmlessness is it wouldn't have made any difference if you had had that cross-examination. Okay. I don't think anybody's disputing that Neville's testimony is important. So, that's not the analysis of harmlessness, it seems to me. But anyway, it's fine. Your time's up. Okay. Thank you, Ms. Brown. For now, anyway. You have rebuttals. See you. Mr. Croswell. Good afternoon. Ryan Croswell on behalf of the United States. You mind addressing that first, as we just had this exchange about the harmlessness analysis. If we conclude there is a confrontation clause violation, can we consider whether the cross-examination he wanted to do would matter? Or are we bound to say if there is a confrontation clause analysis, the only analysis is whether you could have made your case without it, without this witness? Or do we have to reverse it and send it back, and you just try it without Neville and see what happens? Your Honor, I think you certainly could consider that if you sent it back, the result would be that we would still be able to introduce this evidence. He'd now have notice, and it would be harmless because we'd still be able to present this evidence. And if I could cite a case from the Fourth Circuit that may be helpful to that, it's Fields v. Murray, 49 Federal 3rd, 1024. It's not in the government's brief. But in that case, it was a child sex abuse case. And the defendant wanted to… It's not in the government's brief? It's not. But since the question came up, Your Honor, if I could briefly give a recitation of the facts. In that case, it was a child sex abuse case, and the defendant wanted to confront the witnesses himself pro se. And what the Court said was that even if he had properly raised a motion to proceed pro se, the Court would be allowed to prevent him from doing a cross-examination. And I believe the finding was also that if it came back… But so long as he had a lawyer that asked questions on his behalf. It wasn't… Was it a complete, you can't ask any questions of this witness, or you can't ask them directly? It was a you can't ask the… You cannot conduct a cross-examination. And I think the proposition that stands for you, Your Honor, is that you can be denied the right to self-representation, and… Or you can be granted the right to self-representation, but denied the right to confrontation. Are you going to send us a 28-J or something so that we can read this case ourselves to see if we think it's helpful? Certainly, Your Honor. And just a few other points regarding that. I still don't understand what the harmless… You agree that you have to show that it was harmless error, right? It's your burden. If there was error. If there's confrontation clause violation. If there's a confrontation clause there, yes, then it would be the government's burden to show it was harmless error. Do you meet that in this case? As officer of the court, I'm asking you that. I think that'd be tough, Your Honor. I would say that if I could make the case for it, though, I disagree completely that this witness was the only eyewitness. If you go to the record of appeal 2611 to 2643, you'll see the testimony of Ernest Major. He's one of the officers. And he was the eyeballs on that transaction on May 17th. And he watched this transaction take place outside the apartment. Now, he didn't see… He couldn't testify that the drugs were specifically exchanged for the cash. But, Your Honor, he was on a wire. He was talking to officers that were on a wire. They were communicating with the confidential informant. These officers saw him go in with the cash. He came back with the drugs. And the next day, that cash was found on the defendant at the defendant's store, along with 287 pills of ecstasy, marijuana, a digital scale. And I believe that the ecstasy was broken up into little bags divided in 50. Was one of the bases that the defendant had in getting rid of his lawyer the fact that this witness was not asking these particular questions that they wanted to ask of Neville? Well, he's been kind of vague about that, Your Honor. He said that there are articles of evidence that he would have liked to have presented and that there were questions on apparently insignificant points. But to this date, he has never proffered what those questions would have been or what that evidence was. He hasn't done that. Are we bound to say that there is no constitutional violation if a defendant in the former hearing is permitted to expose to the jury facts related to the witness's credibility? Is that black-letter law in the circuit to which we're bound to follow? Or have we yet to traverse this Confrontation Clause issue and we could make a stricter rule in this circuit? Your Honor, first, I think that the law is clear that all that's required is confrontation of witness before evidence comes in within the firmly rooted hearsay exception of 804b1. The only case that the appellant sort of relies on is Crawford. Well, this Court held in United States v. Avant, which is cited in the government's 20HJ letter, that Crawford did not alter the firmly accepted rule that evidence that falls within Rule 804b1 satisfies the Confrontation Clause. Your Honor, actually, to answer a question that you asked the appellant's counsel, if there's any case out there, I, too, looked far and wide and I did find one federal decision with facts that are almost exactly similar. In your brief? It's not, Your Honor. I found it in the past several days. But I can provide it in the 20HJ letter if you'd like. Well, presiding judge is prerogative, but I think it would be helpful. Yes. Thank you. Go ahead and do that in both cases. I think it's only better to put the cases you're relying on in your brief. I apologize. And to find them before the oral argument and not the night before. So that you can put them in the brief. And if you find them before the oral argument the night before, or even the day of, to give them to opposing counsel before, when you get here, so that they can have a chance to read them while you're sitting and listening to the other cases, so that they can rebut them. But go ahead. Thank you, Your Honor. Two other things I just wanted to clear up, too. Appellant's counsel said that evidence related to the death of Garvin Nepple was never introduced, and I think that's actually inaccurate. The autopsy and the toxicology reports were introduced at trial. The pages that the appellant's counsel cites is 2097 to 98. At that point, that was an October 2012 hearing, where the judge stated that the circumstances of his death were relevant. Well, at page 3136, the government says, we have the toxicology report and the autopsy report, and we'll produce them. And at trial, pages 2436 to 2450, the government called a coroner that testified to the fact that there was lots of morphine in Garvin Nepple's body at the time of his death. At the record of trial 2601 to 2605, the defendant actually called a homicide detective that testified to the fact that he was murdered and that heroin was found on him. So in a way, the defendant got two bites of the apple at Garvin Nepple. The vigorous cross-examination in the first trial, and then this evidence about the circumstances of death and about the drugs that were used. Why isn't it harmless error if there was this vigorous cross? I thought you were going to say that because, you know, the points were basically covered in the original cross, there really wasn't much more for Mr. Richardson to do. Well, to be clear, Your Honor, I don't think we ever get to harmless error because I think it's clear. No, I know you think that. Right. Well, and again, I do think that, I mean, I think you can certainly make the case it's harmless error. It's a close call. But certainly with the combination of the evidence and the officers who were there, the eyewitness officer on May 17th, the four officers on May 18th that searched the store and found the drugs, combined with the fact that there was an electronic wire and they could hear what Mr. Nepple was doing as he was conducting this transaction, I mean, there's certainly other evidence. But again, I'm— Are you saying whether the necessary cross-examination was done is not part of the analysis? The question is whether they could make the case without Nepple? I think the government could make the case without Nepple, yes. Okay. But that's not the harmless question. So, yeah, my question is on the harmless analysis, are you saying that we should look at whether the case can be made without Nepple or should we look at whether Nepple's cross-examination adequately covered the area that Mr. Richardson is concerned about? Oh, absolutely, Your Honor, and I think I was confused. The initial cross-examination that the trial court found to be sufficient, it cross-examined Mr. Nepple about prior current charges that were facing him, past convictions, past conduct for which the charges were— So is that relevant to the harmless error analysis? Oh, I think that's— Or are we required to just exclude Nepple in our minds and look at the rest of the evidence in our harmless error analysis? Well, I guess I thought that if you got to the point of harmless error, it would be excluding that transcript if this were to be remanded. I think the initial point first is that all that's required is that this witness was confronted by someone with a similar opportunity and a similar motive. And Appellant's counsel conceded that his counsel certainly had a similar motive. So you're saying the strength of the cross is relevant to whether there's error and then the strength of Nepple as a witness is relevant to the harmlessness. Exactly, Your Honor. So the trial court has a responsibility of reviewing the prior cross-examination and making a determination if it meets the standard of being a—the right to cross-examination. If it's totally inadequate, the judge can then make a ruling that it was not— that it denied him the right to confrontation. Right, and Your Honor, the court found the opposite. The court in its January 24, 2013, ruling found that the cross-examination was meaningful, and this was the ruling where he denied the Appellant's motion to suppress the transcript. He found it was meaningful, and of course, as you're aware, Your Honor, this court has held repeatedly that it is to give great weight to the trial court's assessment. I'm confused. I'm sorry. What post-Crawford case, post-Crawford, says that as long as you have the chance to cross-examine in the previous trial and the witness is now dead, that the previous testimony comes in? What post-Crawford case that binds us, that we're—either it has to be Supreme Court or Fifth Circuit? With this exact set of facts, Your Honor? No, just any that says that automatically, as long as the test is that it has to be— as long as you had a chance to cross-examine by either yourself or a competent lawyer, that that's good enough under Confrontation Clause post-Crawford. What case says that in Fifth Circuit or Supreme Court? I think that the United States v. Vance would be one example of a 28-J letter, but I guess that that case is—what it's doing is sort of reaffirming that in order for 804b-1 and the Confrontation Clause to be satisfied, an attorney with a similar motive and similar opportunity has to be able to have a crack at the witness. And, of course, in a Vance, that was a case where the testimony had been taken 35 years earlier in a State court case, and the witness was now dead. And what the Court said was—excuse me, the appellant objected because the original testimony was in a preliminary hearing. And he said, well, my objective then was discovery. It wasn't impeachment. And this Circuit said that doesn't matter because you had an opportunity, and someone with a similar motive had an opportunity. And it said that that's what matters here. So for the appellant to say I would have done cross-examination differently, I think what you can glean from the Court is that a dissimilar strategy does not equal a dissimilar motive. What's required is someone with a similar motive having the opportunity to confront a witness. This is a Confrontation Clause issue. The first trial— And I guess there must be a showing that the person is unavailable for trial and that the government had nothing to do with unavailability. Exactly, Your Honor. Right. I think that the first trial, the real issue was the defendant was not allowed an opportunity to represent himself. In the second trial, he was. But—and he had what the Supreme Court said, the opportunity to affirm his own dignity and his autonomy and to present his own defense. But that doesn't mean that he gets to skirt around firmly-rooted hearsay exceptions. It doesn't mean that he's given preferential treatment. And that testimony came in within a firmly-rooted hearsay exception. A firmly-rooted hearsay exception doesn't answer the question of whether it violates the Confrontation Clause. I mean, Crawford was watershed, and we have to be able to look at that. Right, right. So that doesn't answer the question automatically. Just because it's firmly-rooted, that it automatically means that it's okay under Confrontation. Right, right, Your Honor. We're not satisfied that under our precedent that we've said that that exception is good enough. Exactly, Your Honor. But I think what Crawford said itself was that testimonial hearsay cannot come in unless, you know, there's been a prior opportunity for cross-examination by a submissive motive. So we have to determine if the hearsay exception satisfies Crawford, unless we've already held it in a binding, precedential way that it does automatically. Yes, Your Honor. I think that the confrontation by Mr. Richardson's counsel in the first trial satisfies both Crawford and the hearsay exception. I mean, they're kind of one and the same, I think. Can you help me with this Chamber's testimony? Yes, Your Honor. How was it that the sergeant started talking about all these things that were improper? It's not some random lay witness. It's a law enforcement officer. How was that that that came to be? Sure, Your Honor. First, it's unclear because the government the next day actually asked the trial court judge if he would like the government to bring Sergeant Chambers back in to explain as to why it wasn't reduced to writing. And I think importantly, the trial judge said no, you don't need to because the testimony is not relevant to the current case. And this is at the record of appeal 2304 to 2309. But is it your position that the questions did not elucidate this testimony, that the officer just spit it all in, and that the questions did not call for this testimony? Exactly, Your Honor. That's an important point because, of course, under Rule 16a1a, the government had to have intended to use the testimony in trial, and it's clear when you look at the record, pages 2248 to 2252, the answer by Sergeant Chambers was nonresponsive. The government attorney asked, did he say anything about posting bond? And that's when Sergeant Chambers gave his answer. Well, he told me that he was a DEA informant. I mean, the district court didn't find that this was kind of convenient, that he's slipping it in? Well, I mean, what the district court judge did in 2304 to 2309 was he kind of admonished the government, you know, you have to make sure that your government witnesses reduce everything to writing. But I think when you read 2304 to 2309, as well as 2248 to 2252, it's clear this caught the government attorney by surprise. The government had no intent to use it, and I think based on that, I'm not even sure that the appellant was entitled to notice of the statement. And certainly with the second statement, which was a Garp and Neville statement, that's not even a statement of the defendant. So I think it clearly wasn't entitled to notice of that. Even if he was, this testimony pales in comparison to testimony admitted in other cases reviewed by this court where it was not found that there was a significant probability that it had a substantial impact on the jury's verdict. So the answers that we're giving, were they responsive to the questions that were made? It was not, Your Honor. And again, Record of Appeal 2248, it's very clear. The question by AUSA was, did he make any statements about posting bond? And the answer was what Sergeant Chambers said about him saying, I have worked as a DEA informant and you'll mess up the deals I'm working. And when you read the record from 2248 to 2252, it's clear that the government attorney did not mean to elicit that, that it caught him by surprise. In fact, the government attorney states in 2252, I hadn't even heard this statement until three days beforehand from a colleague and not from Sergeant Chambers himself. And I think an important point is that oftentimes this court decides whether or not testimony has a significant probability of having a substantial impact on jury verdict. It's sort of considering things in a vacuum. But we know from the first trial, the jury convicted on all three counts without this testimony. I think that is as strong as provable as any is this did not have a substantial prejudicial effect, if it had any prejudicial effect. And I think to the extent that we can debate whether or not the prejudicial effect was there, we're not even the doorstep of a significant probability of a substantial impact on the jury verdict. And one case I'll cite that was in the government's brief is United States v. Elashi. And I may be mispronouncing that. So I'll just say the citation is 554 Federal 3rd 480. That was a case dealing with where the defendants were charged with dealing in the property of specially designated terrorists. The government was told to redact testimony that America practiced terrorism and inadvertently admitted it. And the court found that even though it certainly had a potential prejudicial effect, it was not so significant that it warranted a mistrial. And by the way, in that case, there was no period of instruction. In this case, there was after all three statements. And how many instructions were given by the court? I understand that was just not objection was sustained. There was instruction to the jury, but there was also instruction at the end. Your Honor, yes, there was. After the first statement about the defendant saying that he had been a confidential informant, there was immediate period of instruction to disregard that testimony. After the second statement, Record of Appeal 2271 and 2272, the statement that Garfield Neville had said he was an informant, again, the court gave a period of instruction. And then at the end of Sergeant Chambers' testimony, he said to disregard the statement about the Lortab. One pill of Lortab found with 287 pills of MDMA and money had been exchanged and controlled by the previous day. None of these statements even refer to criminal conduct or criminal convictions. And you can make the case that being a government informant is actually favorable to a defendant. Well, not if your theory is that confidential informants are inherently unreliable. And that was the theory of the case. So it's uniquely unfavorable in this circumstance. I think I disagree, Your Honor. I think that the appellant's argument is kind of non-sequitur. I don't think there's anything inherently dishonest about being a confidential informant. No, but that's his strategy. You don't have to agree with it. Yeah, I'm not saying that I think there's something bad about being a confidential informant. I'm saying that was his trial strategy. And so if you put that he is one, too, and you say it a couple of times, then it hurts his ability to say that the other person was and that that's unreliable. Because then he looks unreliable. Two points, Your Honors. First, it was coming in any way to the transcript of Garfield Neville. Second, Garfield Neville testified to that in the first trial, Record of Appeal 1720. So the defendant knew that that was kind of out there. And third, again, he got to cross-examine Garfield Neville about the fact that he was a paid informant and that he had pending criminal charges in the state court. And I see that I don't have much time left. So, again, the United States respectfully asks that you affirm the appellant's convictions and sentence. Thank you very much. Ms. Brown. Thank you, Your Honor. I'll start in reverse order. I just want to point out a few disagreements we have with the record. So far as the only other reference to confidential informant was in Neville's prior testimony, where they were asking Neville, Neville alleged that he called the defendant to arrange the buy and that after the buy that Mr. Richardson called him later that day and told him that the money was marked. There was testimony in the record that marked money is not really physically marked. It's just that serial numbers are recorded. So, you know, there would be no way for Richardson to have known that they had recorded serial numbers. But that was Neville's testimony. He said that defendant called him later that day and told him the money was marked. Defense counsel asked Neville, how would the defendant have known that the money for the drugs was marked? And Neville responded, Almond himself was a CI, sir, and he already probably had the notion of what I was doing because that's what I was set up to do when I first met him. That was the only other confidential reference to him being a confidential informant. And it's so nonsensical that he could have probably handled it some other way because, again, that's his statement is the reason he called to say the money was marked was because he would have had a notion. If he had a notion, he wouldn't have been selling the drugs. And how would that have clued him in that the money was marked? So that's it so far as the CI testimony, besides that's the only other reference. Then so far as the statement where the government elicited the testimony from Chambers, this is actually the context in which it arose. The prosecutor says, OK, and did Mr. Richardson make any statements to you regarding his second arrest? Sergeant Chambers says he was claiming that we planted drugs on him. The prosecutor says, did he say anything about being out on bond or anything like that? Sergeant Chambers says he advised that he is an informant for DEA and that if we arrest him, it's going to mess up all these deals that he is doing with the DEA. The prosecutor says, did you discover any information that suggested that when he was arrested he was an informant for the DEA? I mean, so and then Sergeant Chambers says I actually called a DEA agent. Anyway, to say that it was elicited from him, I mean, maybe he didn't specifically say that, but he pursued it. He followed up questions. And then at that point is when Mr. Richardson objected. And then the admonishment and pointed out this statement was a surprise. And Sergeant Chambers had testified at the first trial and did not make any of these statements at the first trial, so he had no way to know that he was going to. And then what the government instructed him after that was, ladies and gentlemen, I specifically admonish and instruct you to disregard the prior testimony. You heard regarding statements attributed to the defendant. Under the federal rules of evidence, the defendant is entitled to receive any statements attributed to him prior to trial. It appears that wasn't done in this case. Therefore, it's not proper for you to consider that information. And so that doesn't seem fair at all to curate. So he wasn't, the jury finds out he didn't get proper notice, some procedural rule wasn't followed. That doesn't undo the damage occasioned by the substance of the statements. So that's, I mean, that's not, that it was insufficient to curate. In my experience, juries find the rules very important to follow, and then when judges tell them that the rules have been violated, they take that seriously. Well, still, the substance of the statements then casts Mr. Richardson as a confidential informant, and even if he didn't get proper notice, I don't see how that would be sufficient to cure the damage occasioned by the statement, given the theory of his defense that confidential informants are unreliable. And then I guess the final point to make is in regard to the confrontation violation. Again, I would, you know, this does present an unusual situation. As far as I've found, there's been no precedent that would foreclose the court from finding the confrontation violation. And then I would urge the court to consider it carefully in light of the facts of this case, considering that, oh, and Mr., one thing you had brought up was that whether or not he had complained about the cross-examination conducted by his prior attorney, and, in fact, he did bring that to the court's attention, and that's in the record, I think it's 2450. I think so. All right, that's all I have. Thank you. Thank you, Ms. Brown. Your court appointed the second time around.